TOBIAS, J.,
concurs in the result in part, dissents in part, and assigns reasons.
I respectively concur in the result reached by the panel due to the extraordinary facts presented in this case. However, I write separately to address some concerns that I have.
From the oral reasons for judgment assigned by the trial court, it appears that *1169 the state’s petition to terminate parental rights was denied due to the possibility that the state will immediately remove W.M.O. and R.M.O. from their current fosters home before suitable adoptive families were found and that these minors will never be adopted. Certainly, these are legitimate concerns. The evidence reveals that both children are in safe and caring foster homes and have greatly benefited from the structure, supervision, and consistent discipline received from their foster families. It is obviously important that DSS/OCS leave W.M.O. and R.M.O. in their present foster homes unless or until appropriate and permanent homes are found.
The testimony was that it is unlikely that W.M.O. will be adopted because of his special needs (pervasive personality disorder, disruptive behavior disorder, post-traumatic stress disorder, and moderate mental retardation) that require medication and around-the-clock supervision. It is difficult to comprehend the damage that has been done to this 12-year old child such that he is now a sexual li»perpetrator who cannot even be left alone with his own brother, much less any other child or unsuspecting adult. It is possible that once W.M.O. reaches puberty, intensive inpatient treatment may be necessary. The testimony was uncontroverted that W.M.O. should not have any further contact with his mother and that it would be in W.M.O.’s best interest to have parental rights severed.[1] Under these facts, I find no reason to deny the state’s petition for termination of parental rights insofar as W.M.O. is concerned. Again, however, because of W.M.O.’s special needs, DSS/OCS should obviously leave him in his current foster home, where he has been for over five years, for as long as possible. Consequently, I concur in the majority’s decision to terminate E.O.’s parental rights to W.M.O.
R.M.O., 10 years old, presents a different set of issues. This child, who has been diagnosed with ADHD, bipolar disorder, post-traumatic stress disorder, and nocturnal enuresis, has a warm relationship with his mother and 13-year old brother, as demonstrated in their supervised visits. When told that he may not ever see his mother again, R.M.O. reacted aggressively and threatened to harm his foster family.[2] Such a response demonstrates the bond R.M.O. feels towards his family, a factor that should be considered when determining what would be in his best interest.
On the other hand, even after five years of services, the DSS/OCS and various experts could not say when or if the mother will ever be able to care for R.M.O. and his special needs. Thus, there is no compelling reason to allow R.M.O. to remain in long-term foster care. The fact that it may prove difficult to obtain an adoptive home for R.M.O. does not provide such a reason; children in | Termination proceedings do not have to have an adoptive prospect for termination to be in their best interest.
La. Ch. C. art. 1001 sets forth the purpose of a termination of parental rights proceeding:
The purpose of this Title is to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all *1170 parental rights and responsibilities and for the certification of the child for adoption. In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if at all possible, to achieve the child’s adoption. [Emphasis supplied.]
The Children’s Code specifically provides for the possibility that children certified for adoption do not already have adoptive placements when parental rights are terminated. Within ninety days of the judgment, La, Ch. C. art. 1041 requires DSS/OCS to actively promote and recruit an adoptive home. During this process, La. Ch. C. art. 1042 requires regular review hearings to monitor the process. Only when adoption proves unavailable should long-term foster care. be considered. Therefore, I agree with the majority in finding that termination of parental rights is in the best interests of R.M.O.
The testimony regarding R.M.O. was also that it would be in his best interest to maintain continuing contact with his mother and older brother. The Children’s Code provides a means for on-going assessment of contact between R.M.O. and his biological family post-termination judgment. La. Ch. C. art. 702(D) requires the court to “consider a child’s need for continuing contact with any relative by blood, adoption or affinity with whom the child has an established and significant relationship.” The pre-adoption continuing contact is provided for through La. Ch. C. art. 1037.1(A), which provides in pertinent part:
| ¿Subsequent to a termination of parental rights judgment when custody is granted to the department, the court may order continuing contact between the child and the parent, sibling, or other biological relative. The court may grant such an order only after it makes finding of fact that continuing contact is in the best interest of the child. The court may receive expert testimony on the issue of continuing contact. [Emphasis supplied.]
I find that R.M.O.’s therapist(s) should determine the scope of the continuing contact, noting his evolving needs. This contact can even continue after R.M.O. is successfully adopted. La. Ch. C. art. 1269.1 states:
A.In an agency adoption in which the department is the custodian of the child, the court may approve an agreement providing for continuing contact between the child to be adopted and his grandparent, sibling, and any parent if both of the following conditions are met:
(1) The child has an established, significant relationship with that person to the extent that its loss would cause substantial harm to the child.
(2) The preservation of the relationship would otherwise be in the best interest of the child.
B. If there is no parental relationship that meets the requirements of Paragraph A, the court may approve an agreement providing for continuing contact between the child to be adopted and any other relative by blood, adoption, or affinity whose relationship with the child meets those requirements.
C. When adoption is approved by the court as the permanent plan for the child, the department shall inform any parent, grandparent, sibling, or any other relative by blood, adoption, or affinity who meets the requirements of Paragraph A or B, of the possibility of post-adoption contact with the child upon *1171 agreement with the adoptive parents in accordance with the provisions of this Chapter. [Emphasis supplied.]
Continuing post-adoption contact is permitted if the court should find that the loss of the relationships with his mother and brother would cause substantial harm to R.M.O.
1 sBecause the majority opinion does not include a remand to the trial court with instructions to determine a plan of continuing contact between R.M.O. and his mother and older brother, I respectfully dissent, for I cannot say in that regard (inherent in the trial court’s reasons for judgment) that the trial court is either manifestly erroneous or clearly wrong.

. Dr. Cornelius Schutte, W.M.O.’s psychologist since 2000, testified that he did not anticipate that W.M.O. would have any significant emotional problems if there was no visitation with his siblings.

. However, after an intervention removed R.M.O. temporarily from the foster home, he returned and apologized to his foster mother.